# CHARLESTON.

## WALKER'S ADM'X *v.* PECK.

Submitted January 30, 1894.—Decided April 4, 1894.

HUSBAND AND WIFE—SEPARATE ESTATE.

Where property is alleged to have been purchased by a wife, or a conveyance has been made to her during coverture, the burden is upon her to prove distinctly, that she paid for the property with means not derived from her husband ; and in the absence of clear proof, that it was not acquired with his means, the presumption is, that it was acquired with his means, and it will be liable for his debts. But, on the other hand, if she furnish evidence clearly showing that it was acquired with her separate means, or that it did not come from her husband's means, it must be protected as her separate estate from his own acts seeking to make it liable to his creditors as well as from their acts.

W. T. ICE and E. WILLIS WILSON for appellants cited 12 W. Va. 350; 94 U. S. 580, 584; 18 Wall. 476; 22 W. Va. 673; 23 W. Va. 439; 24 W. Va. 199.

DAYTON & DAYTON and J. J. DAVIS for appellee, cited 37 W. Va. 242; 34 W. Va. 583; Well's Mar. Wom. 169 § 113; 11 Mich. 482; 17 Gratt. 503; 34 W. Va. 128; 18 W. Va. 75; 22 W. Va. 348; 36 W. Va. 191.

BRANNON, PRESIDENT :

Samuel C. Walker executed a deed of trust on certain personal property to secure a note made by Samuel C. Walker to his brother, Henry S. Walker, and Emma D. Walker, the wife of Samuel C. Walker, made claim to some of said property ; and to overthrow this claim as a cloud over the property, and enjoin Mrs. Walker from disposing of it and subjecting the property to sale under the deed of trust, Henry S. Walker brought a chancery suit, and the bill hav-

ing been dismissed by the Circuit Court of Barbour county, the administratrix of Henry S. Walker appealed.

A considerable part of the property conveyed by said deed of trust was disclaimed by Mrs. Walker and sold by the trustee—a circumstance arguing in favor of her honesty in this transaction. The sole question involved in the case is: Was that portion of the property covered by said deed of trust claimed by Mrs. Walker in fact hers and exempt from the deed of trust, which she did not sign, or was it the property of her husband and liable under the deed of trust? This is simply a question of fact, and no question of law comes into the controversy to call for any discussion, and a detail of the evidence would answer no purpose useful to the courts or bar in future cases. The evidence as to whose property it was is confined substantially to the deposition of the husband and wife, the husband having been put on the stand by the plaintiff.

To sustain the plaintiff's cause appeal is made to the case of *McMasters* v. *Edgar*, 22 W. Va. 673, and other cases holding the principle, that, where property is asserted to have been purchased by a wife during marriage, the burden is on her to prove by clear and full proof that she paid for it with means not derived from the husband. This rule was made to defeat fraud. We stand by it. The courts will under it in proper cases brush away purchases made by and conveyances made to wives of husbands indebted, who seek to cover up their means from the pursuit of creditors under the names of their wives. But it is not every purchase or acquisition by a wife that is fraudulent. If she reasonably and fairly show, that the property came from her means or not from her husband's—satisfy a court's or jury's conscience about it—it is inequitable and unjust to rob her of her property to pay her husband's debts.

The statement of the rule in *McMasters* v. *Edgar* states also the converse—that, if the wife do prove that the property was honestly acquired with her means, it ought to be protected in her favor. The evidence in the case before us shows this fully and above suspicion. James Pickens, father of Emma D. Walker, was a wealthy man. She married in 1877. Her father gave her a farm of three hundred

and thirty seven and one half acres, valued at thirteen thousand and four hundred dollars, and in 1879 she and her husband moved upon it. Her father died in January, 1887, and from his estate she received over one thousand and one hundred dollars in money. Her husband is not shown ever to have had any considerable amount of means. When they went upon the farm he had one thousand and five hundred dollars, and he says he put valuable improvements upon the house and farm with the joint labor of himself and wife to the amount of one thousand dollars or one thousand and two hundred dollars, he paying all the money used therein; but when asked, how much money he so applied, his answer was: "I am not able to say." The wife says that he used of his one thousand and five hundred dollars a few hundred dollars in remodeling, papering, and painting the house on her farm, and the balance went to living expenses. Thus he had disposed of his means otherwise than in the acquisition of the property in controversy. Suppose he put it all in improvements on her land. That can not help the plaintiff. By devoting it to such improvements it was a gift to her, giving him no demand against her except as to creditors. But there were then no creditors to be wronged thereby. It is not involved in this suit. The note given to his brother by Samuel C. Walker was not given until about ten years later—July 29, 1889.

The husband though seeming from some passages in his deposition to claim ownership of the property in controversy, and justify his act in giving the trust, does not squarely and unequivocally do so. His idea of his ownership seems nothing more than that, as he was her husband, and some of it is his, and the property was on the farm, he owned it. He owed his brother and perhaps thought his wife would ratify the act. His strongest statements in direct examination are hesitating and qualified. He was asked, who had right to possession of the property at the time he made the trust-deed, and answered:—"I supposed I had." Why suppose merely? He was asked then: "You say you suppose you had. Don't you in fact know that it was your property?" Answer: "Why of course it was

my property, or I supposed it was my property; and I would not have executed that trust, if I had not been of that impression." Why use the word "impression"? He is an intelligent man, and if he had bought the property his knowledge would rise above an impression. He could not say how long he had been owner of the property involved. He not only does not tell us where he got his property; but on cross examination being asked specifically as to particular horses and cattle he admits that they were gifts from her father or the progeny of those so given. This applies to all the property his wife in her deposition claimed. He on cross-examination proves her title.

The husband and wife borrowed money of her father on their joint note, and invested it in nine colts. She and he both say that she paid all this note. She and he both swear that she sold four of the best of these colts and three of her own and applied the money on a debt of his to Mrs. Ann M. Pickens, who was given a preference as to the colts in the trust-deed. Henry S. Walker, by accepting the trust containing this preference, assented to such application of the colts. She paid a small balance of twenty five dollars on this debt out of her own pocket. He had in a sense a half interest in those colts, which should have gone to help her pay their purchase-money, but it went to pay his own debt. Out of a sense of pride and liberality which wives feel for their husbands she paid to her loss as in other instances developed by the evidence.

In February, 1888, Samuel C. Walker himself left the farm and engaged in mercantile business for about two years in Charleston, leaving his wife on the farm in Barbour county. Before leaving, in December, 1887, he made a bill of sale to his wife of eight horses. This is complained of as a secret bill of sale. There is not a syllable of evidence, that she made it a secret. The bill states that it was made to enable her to sell the property to reimburse her for payment of a note of one thousand three hundred and fifty dollars given by him to Dever Pickens, on which she had paid six hundred and thirty five dollars and thirty five cents and he had paid seven hundred and fourteen dollars and sixty five cents; she having paid said balance at the demand of

said Dever Pickens, executor of his father, out of her share of the personalty of her father's estate in his hands. For pride in her husbend, and because demanded of her, she had already paid this debt of her husband and held his note, as the bill of sale says, and they both solemnly swear. Only one of the horses included in this written bill of sale was included in the trust-deed. Six of them were horses he had purchased of Dever Pickens, for which he had given the note; and so they only went to pay their purchase-money. There is no badge or circumstance of fraud in this. Instead of having money to buy the contested property he was in debt, and she paid for him beyond what he had property to pay.

She says that what he paid on the Dever Pickens note was more hers than his money. He purchased a tract of forty two and one half acres adjoining his wife's farm at one thousand and six hundred dollars. Only part has been paid. She paid six hundred dollars of it, as she swears. She admits he owned thirty four cattle, which were grazed on her farm. She sold them while he was absent at Charleston, and sent the money which they realized without any deduction for grazing to pay a debt to the Kanawha Valley Bank to pay a note given by her husband, with Henry S. Walker as surety, for money to buy the cattle with, and paid one hundred and seventy five dollars on store bills in Clarksburg, which he had contracted before he went to Charleston, and a note of her husband's to Lee Smith of one hundred and seventy five dollars, and one of one hundred and fifty dollars to Dr. Peck; furnishing some money herself over what the cattle sold for. This property is, of course, not involved in this suit, and is mentioned only to show, that the wife never secreted a dollar of the husband's property, but every dollar of it went to pay debts of his, which neither he nor any one else has denied, and to show, that he had no means to acquire the property in contest.

Mrs. Walker makes a clear, definite, and intelligent statement about all the matters pertinent to this case, giving circumstances of time, place, and person, and seems to be speaking the truth; and, if she was not, it was easy to show that her version was incorrect. And, besides, as above

stated, the property involved was stock given by her father or its increase. The specific property, naming particular horses, colts, cattle and some utensils, are specifically accounted for as coming from her father. She in a word had a very considerable clearly-proven separate estate received from her father. He had virtually no estate. Both he and she tell us of this separate estate, and a disinterested witness—clerk of the County Court of Barbour—tells us that she derived from her father a "large estate in land;" and as to personalty he did not know the amount, but that her father left a large estate real and personal. On her fine farm the stock was raised. The very stock itself came from her father. There is no showing to the contrary. Where is the fraud against a creditor? The wife's contention in the case is fair under all the evidence adduced, and her property rights accounted for from a legitimate source. He no doubt devoted his time, jointly with the wife, to the management of the farm; but this does not subject this property to the deed of trust. Trapnell v. Conklyn, 37 W. Va. 242 (16 S. E. Rep. 570). He, in fact, left the farm, and engaged in business elsewhere. She seems to have been active herself in the management of the farm. The property was in her possession. She says she always controlled it and never but once did the husband sell an article of her property, until he made the deed of trust; and in that instance she told him he must never do so again. She says she was shocked when she heard of the deed of trust, which was made in Charleston, while she was on her farm in Barbour.

It is urged against her, that after the execution of the trust she declared to the trustee, that she would not keep the property without pay. She says, that when the trustee informed her of the deed of trust, she informed him she would not keep the property without being paid for it. She says it was then out on pasture, and she was paying for it. She meant not to concede that the property was liable. That is repelled by her stubborn and uniform claim that it was her property. It was in contest and litigation. She says she only requested, after the suit brought, that it be sold, to stop cost of keeping until the matter was

settled. Fairly treated, this meant only that a controversy was pending, and, if it should go against her, she would demand reimbursement for expenditure of keeping the property. If determined to be liable for the debt, it was not just that she should keep it after the trust—keep property for the benefit of others without pay. The trustee promised to pay cost of keeping stock, if the property was made liable to the deed of trust. If she gives a wrong version of this, the trustee could give the true one.

Another matter is urged against her; that is, that Samuel C. Walker was assessed in 1887 and 1888 with personal property to the amount of one thousand seven hundred and fifty five dollars and one thousand six hundred and ninety dollars, while the wife was assessed with none; whereas in 1889 she was assessed with one thousand seven hundred and fifty dollars, and in 1890 with six hundred and sixty five dollars, and he with none. Assessors are careless in assessments. Usually they assess property in the name of the husband, as the head of the family and *prima facie* owner, unless their attention is particularly called to the separate ownership of the wife. The evidence of the clerk gives some reason to say, that assessors in Barbour usually assessed property of both wife and husband in the husband's name. Mrs. Walker states that she was several times present when the assessor was listing, and he never asked in whose name it should be assessed. Her husband says so too. Listing her property in his name would not make it his. The circumstance of listing the property is not important. The explanation is that, when the husband was at home and gave in the property, it was charged in his name, and when he was absent in Charleston, and the wife gave it in, it was charged in her name. When, for the first time, a new assessor asked as to the ownership, she says she gave in her property and his separately at the assessor's request. She consented that his as well as hers be assessed to her. She is frank about this. If this separate statement of each one's property be false, why not so prove by the assessor?

We think the decree of the Circuit Court ought to be affirmed.